# IN THE COURT OF APPEALS OF IOWA

No. 24-2020
Filed October 29, 2025

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**SEBASTIAN MICHAEL LANDRUM,**
    Defendant-Appellant.
_____

    Appeal from the Iowa District Court for Scott County, Meghan Corbin, Judge.

    A defendant appeals his sentences for dominion or control of a firearm by a felon and possession of a controlled substance, marijuana, second offense. **AFFIRMED.**

    Martha J. Lucey, State Appellate Defender, and Bradley M. Bender, Assistant Appellate Defender, for appellant.

    Brenna Bird, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.

    Considered without oral argument by Schumacher, P.J., and Badding and Langholz, JJ.

**LANGHOLZ, Judge.**

During a traffic stop, Sebastian Landrum was found with a gun and marijuana in his vehicle. He had been convicted of both a felony and possession of marijuana. So as part of a plea agreement, he pleaded guilty to dominion or control of a firearm by a felon—a class "D" felony—and possession of a controlled substance, marijuana, second offense—a serious misdemeanor. *See* Iowa Code §§ 724.26(1), 124.401(5)(b) (2024). The district court sentenced Landrum to an indeterminate five-year prison sentence on the felony and a one-year sentence on the misdemeanor to be served concurrently. The court also ordered the Department of Corrections to screen Landrum for the Tech2Connect reconsideration program[1] and invited Landrum to apply for reconsideration of his sentence if he successfully completes that program within one year.

Landrum now appeals his sentences. He argues that the district court abused its discretion by failing to adequately explain its reasons for the sentences, relying on only a single factor, and selecting the prison sentences rather than suspended sentences with probation. But the district court adequately explained its sentencing reasons, properly considered multiple factors, and did not abuse its considerable sentencing discretion in selecting concurrent five-year prison sentences. We thus affirm Landrum's sentences.

---

[1] According to the Iowa Department of Corrections website, Tech2Connect is a collaboration between the Seventh District Department of Correctional Services and seven prisons that provides "reentry services as soon as clients arrive in prison through programming and communication via tablets." *Tech2Connect Reentry*, 7th District, Iowa Department of Corrections, https://perma.cc/4X3V-RXWC.

## I.    Explaining the Reasons for the Sentences Imposed

Landrum first argues that the district court failed to adequately explain its reasons for selecting his sentences.  A sentencing "court shall state on the record the basis for the sentence imposed."  Iowa R. Crim. P. 2.23(2)(g).  This rule "ensures defendants are well aware of the consequences of their criminal actions" and "affords our appellate courts the opportunity to review the discretion of the sentencing court."  *State v. Luke*, 4 N.W.3d 450, 456 (Iowa 2024) (cleaned up).  "[S]omething more specific" than "a boilerplate statement of reasons" is required.  *Id.* at 457 (cleaned up).  But "a terse and succinct statement may be sufficient, so long as the brevity of the court's statement does not prevent review of the exercise of the trial court's sentencing discretion."  *State v. Thacker*, 862 N.W.2d 402, 408 (Iowa 2015) (cleaned up).  Still, "the reasons for the exercise of discretion" must be "obvious in light of the statement and the record before the court."  *Id.*

At Landrum's sentencing hearing, the court explained:

> Mr. Landrum, it's my duty to review what's available to me in terms of community resources and an appropriate rehabilitative plan for you, but also to consider that the community must be protected.
> In doing so I look at the seriousness of the crime, the effect that the crime has had upon the members of the community, as well as your willingness to accept treatment and change, and what's available within the community to assist you in the rehabilitative process.  I first look to the least restrictive alternatives, then proceed to the more restrictive alternatives.
> I have reviewed the information contained in the Presentence Investigation Report; however, I have not given any consideration to any entries in the PSI that do not contain an admission or an adjudication of guilt.
> The problem, Mr. Landrum, is the lack of community resources that I have available to me to assist you in the rehabilitative process.  You have been given supervised probation in the past and it has not gone well.  You have utilized a number of different programs, including the Tech2Connect.  We have utilized Vera French, Iowa Workforce Development, CADS.

After a brief interruption by Landrum, the court continued:

> I can appreciate that you have made recent changes. It's great that you went away to school. And my concern was actually echoed by the PSI writer that even that positive momentum and that change, it just wasn't quite enough to get you to abandon the negative behaviors.

And after imposing terms of incarceration, ordering the Department of Corrections to screen Landrum for the Tech2Connect reconsideration program, and inviting him to move for reconsideration of the sentence if he successfully completed the program, the court summed up:

> The reasons for this sentence, Mr. Landrum, are your extensive criminal history and the lack of community resources available outside of the prison systems, as well as the terms of the plea agreement and the nature of this offense.

This thoughtful explanation went beyond mere boilerplate. The court "did what a sentencing court should do," giving "an on-the-record explanation, based on appropriate factors and tailored to the facts and circumstances of the specific case, for why it was sending [Landrum] to prison." *Luke*, 4 N.W.3d at 458. We thus reject Landrum's challenge to the adequacy of the court's statement of the reasons for the sentences imposed.

## II. Considering Only a Single Factor

Landrum next argues that the court improperly relied "solely on his prior criminal history to impose the prison sentences." When selecting an appropriate sentence, the court must decide what "will provide maximum opportunity for the rehabilitation of the defendant, and for the protection of the community from further offenses by the defendant and others." Iowa Code § 901.5. To do so, "the court must consider the nature of the offense, the attending circumstances, the age,

character and propensity of the offender, and the chances of reform." *State v. Gordon*, 998 N.W.2d 859, 862 (Iowa 2023) (cleaned up). A court cannot rely on only a single factor. *See State v. Dvorsky*, 322 N.W.2d 62, 67 (Iowa 1982) (reversing manslaughter sentence when court gave only one reason—that the defendant caused "the loss of life"). But placing "considerable emphasis" on a particular factor at sentencing is not an abuse of discretion so long as a court also "consider[s] other factors pertinent to sentencing." *State v. Leckington*, 713 N.W.2d 208, 216–17 (Iowa 2006).

The district court did not rely on only Landrum's criminal history. The court expressly considered multiple other factors. It said that it was basing the sentence on "the nature of this offense," "the plea agreement," and "the lack of community resources available outside of the prison systems," in addition to Landrum's "extensive criminal history." To be sure, the court gave the most emphasis to Landrum's lack of success in rehabilitation, including prior supervised probation, during his extensive prior involvement in the criminal-justice system. But the court did not abuse its discretion by improperly relying on only a single factor.

### III. Selecting Prison Rather than Probation

Finally, Landrum argues that the court should have suspended his sentences and placed him on probation rather than imposing terms of incarceration. We review a district court's discretionary selection of a sentence, including its exercise of discretion whether to suspend a sentence, for an abuse of discretion. *See State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002). This deferential standard of review recognizes that the court's decision "to impose a particular sentence within the statutory limits is cloaked with a strong presumption

in its favor." *Id.* And even when the court would have been justified in imposing the sentence the defendant sought, "our task on appeal is not to second guess the decision made by the district court, but to determine if it was unreasonable or based on untenable grounds." *Id.* at 725.

Landrum argues that the district court disregarded his "personal situation" and "the treatment options available." And he urges that properly considering "all the circumstances" shows that suspended sentences with probation—rather than prison—"would afford Landrum with the maximum opportunity to be rehabilitated and would provide him the support and structure he needs to break this cycle and build a better life."

But we see no sign that the district court ignored the circumstances that Landrum highlights. And despite his attempt to characterize his arguments as something else, in essence he contends that the court should have weighed the evidence and the sentencing factors differently to conclude that a suspended sentence was appropriate. But that is not the issue we decide on appeal. *See Gordon*, 998 N.W.2d at 863 ("The test for whether a sentencing court abused its discretion is not whether we might have weighed the various factors differently."). Landrum fails to point to any unreasonable or untenable grounds in the court's reasoning. *See id.* Nor do we see any.

Considering Landrum's circumstances and the rehabilitation services available inside and outside prison, the district court exercised its judgment to conclude that prison rather than probation was appropriate for Landrum. And it gave Landrum "a break" that he could "choose to capitalize on" by ordering the Department of Corrections to screen him for the Tech2Connect program and

inviting him to seek reconsideration of his sentence upon his "successful completion of the Tech2Connect Program" within one year. Because the district court did not abuse its discretion in exercising this sentencing judgment, we affirm Landrum's sentence.

**AFFIRMED.**

Schumacher and Badding, JJ., concur; Langholz, J., specially concurs with Badding, J., joining.

**LANGHOLZ, Judge** (specially concurring).

I continue on, beyond what is needed for the court to decide this case, to explain my persistent use of the legal-citation parenthetical (cleaned up) despite the contrary guidance of the latest edition of the *Bluebook*. *See The Bluebook: A Uniform System of Citation* R. B5.3, at 9 (Columbia L. Rev. Ass'n et al. eds., 22d ed. 2025) [hereinafter "*Bluebook*"]. Some may question—perhaps rightly— the importance of such a technicality. But I find the organic adoption of (cleaned up) to be a remarkable innovation in legal citation that improves the readability of judicial opinions and written advocacy. And (cleaned up) more accurately describes the practice that it notes than the *Bluebook*'s alternative: (citation modified). In short, (cleaned up) is worth saving. And I hope that the bench and the bar will not be bullied by the *Bluebook* into letting it die.

*The (cleaned up) Parenthetical*. In 2017, an attorney proposed a new legal citation practice to address the problem of "excessive punctuation clutter" and "citation baggage" that accumulates when a legal writer quotes authority that itself quotes other authority. Jack Metzler, *Cleaning Up Quotations*, 18 J. App. Prac. & Process 143, 153 (Fall 2017) [hereinafter "*Cleaning Up*"]. Reasoning that this clutter "often provides no meaningful information for readers but instead risks distracting them from the text and taxing their ability to assign weight to quotations as they read," he suggested a better way: letting writers "drop superfluous material like brackets, ellipses, quotation marks, internal citations, and footnote references from their quotations by using a single new parenthetical—*(cleaned up)*—to signal that such material has been removed and that none of it matters for either understanding the quotation or evaluating its weight." *Id.* at 147, 159 (cleaned up).

The proposal went viral. Originally suggested to the world in a tweet, by the time it was more fully fleshed out in an academic article a year later, many lawyers and courts across the country had adopted the practice. *See id.* at 143 n.\*, 160–61. And now, over eight years later, (cleaned up) has taken root. A comprehensive survey of its use is not practical here given its ubiquity in state and federal court opinions. It should be enough to say that the federal courts of appeals have collectively used (cleaned up) in at least 6,000 opinions. And our court alone has used it in over 600 opinions since first doing so in 2018. *See In re S.B.*, No. 18-0891, 2018 WL 3471619, at \*3 & n.3 (Iowa Ct. App. July 18, 2018).

I believe that the speed and breadth of the organic growth of the use of (cleaned up) reflects its readily apparent benefit—improving the readability of judicial opinions without sacrificing accuracy. That is why I use (cleaned up), including in the court's opinion here. When quoting the governing precedent from our supreme court, it matters not that parts of the quotations were themselves quotations from prior supreme court cases. Adding in sets of internal quotations marks to set off those parts and extra parentheticals citing the cases from which those internal quotations came would serve little purpose. It is the words used by the supreme court in the case we quoted that govern. *See Cleaning Up*, at 152 ("A court's decision is expressed in the words it uses in its opinion, not in the brackets and ellipses that might also appear in the opinion."). And (cleaned up) alerts a reader that wishes to dive deeper that there is a quotation within the quotation that could be checked out by reading the cited case. So I generally see no need to clutter up our opinions with extra punctuation and citation baggage.

Of course, there are exceptions where using (cleaned up) could remove important information. For example, perhaps the most on-point precedent is an unpublished case of our court that quotes from our supreme court. Or maybe on a question of federal law, we rely on a quote from our supreme court that quotes the United States Supreme Court. In either case, a reader would likely get much value from our notation that a portion of the opinion we are quoting is itself quoting from an opinion of the authoritative court of last resort rather than sweeping that information away with (cleaned up). But these citation judgment calls are not that much different than any other that judges make in doing our best to write an accurate and readable opinion that faithfully sets out and applies the law.

*The Bluebook's Alternative: (citation modified)*. When first proposed, the (cleaned up) parenthetical conflicted with the citation rules of our profession's predominant citation style guide, the *Bluebook*. The *Bluebook* is a collaboration between the student-run *Columbia Law Review, Harvard Law Review*, *University of Pennsylvania Law Review*, and *Yale Law Journal*. *Bluebook*, at viii. So each edition is "compiled" by the law-student editors of these journals. *Id.*

Earlier this year, the latest edition of the *Bluebook* was published. And for the first time, it officially authorized the practice of cleaning up quotations—at least for non-academic writing. *See Bluebook* R. B5.3, at 9. The new rule basically mirrors the substantive scope of the 2017 proposal for the (cleaned up) parenthetical. *Compare Bluebook* R. B5.3, at 9, *with Cleaning Up*, at 154–55. But there's a catch. The *Bluebook* directs a writer to indicate that quotation has been decluttered of excess punctuation and citation baggage with the parenthetical (citation modified) rather than (cleaned up). *See Bluebook* R. B5.3, at 9.

The *Bluebook* offers no explanation for the name change aside from a "tip" warning: "The parenthetical '(citation modified)' should be used in lieu of any other parenthetical that indicates a quotation or citation has been modified for readability, such as '(cleaned up),' especially when such parentheticals lack a definite meaning in practice." *Id.* But one of student editors involved in the revision process explains in a forthcoming book review that the change was driven by the refusal of one collaborating journal to agree to "cleaned up" because the journal had "a sour interaction" with the attorney who originally proposed it and so "did not want to use a term he coined" and it "also did not want it to seem like individual lawyers could dictate the terminology of citations to *The Bluebook*." M. Burke Craighead, *The Bluebook: An Insider's Perspective*, 124 Mich. L. Rev. (forthcoming 2026) (book review) (manuscript at 7), *available at* https://perma.cc/F34F-EY7B.

After eight years of courts and advocates using and reading (cleaned up), it would be a hard sell to ask us all to adopt a new name under any circumstance. *See Cleaning Up*, at 154 n.45 (noting—over seven years ago—that the proposal originally included "other possible forms of the parenthetical" that were dropped after concluding "the period during which we could have adopted a different term has all but closed" because of "how far *(cleaned up)* has spread"). But with no legitimate basis for the name change, it should be a nonstarter.

Even setting all that aside, the *Bluebook*'s alternative name is inferior to (cleaned up). The term "citation modified" is a misnomer twice over. First, a writer using the parenthetical is not doing anything to the "citation." The citation comes in the clause or sentence after the quotation, telling the reader the quotation's source. Take for example, the first use of (cleaned up) on page 3 of the court's

opinion here. The citation is: "*State v. Luke*, 4 N.W.3d 450, 456 (Iowa 2024)." And we modified nothing about the case name or other information in that citation. Even if the term is intended to refer to a modified citation inside the quotation rather the citation sentence, that too makes no sense because no citation is left in the quotation after cleaning up the clutter.

Second, the writer has not "modified" anything of substance. True, the writer has omitted punctuation marks and internal citations to leave only the substantive words as used by the quoted source. But it would be misleading to say this is a modification of that quotation—the essence of cleaning up a quotation is accurately quoting the substance of the source. Any modifications made by the writer should still be noted. Yet a parenthetical noting that the writer had "modified" something suggests there could be any modification—even substantive—leaving the reader confused and wary.

Bottom line, "cleaned up" is a more accurate description of the quotation-decluttering practice that the *Bluebook* now authorizes. We should keep using it.

*One Caveat*. Still, I have one substantive quibble with the scope of cleaning up authorized by the *Bluebook* and the rule proposed by Metzler. Both authorize the writer to modify the quote to change capitalizations without noting the change by using brackets in the quote. *Compare Bluebook* R. B5.3, at 9, *with Cleaning Up*, at 154. I think this goes too far. In my view, using (cleaned up) does not weaken the intellectual integrity of a judicial opinion because the quotation still accurately states the text used by the quoted court. But altering the capitalization deviates from this principle. The writer is introducing another change beyond the splicing and alterations of the quoted court. And while capitalization is minor, a

reader still gets important information from the use of brackets to show that the writer is making such a change.  For example, noting a change to capitalize the first quoted word used to start a sentence tells us that the writer is cutting off some initial part of the quoted sentence.  And fundamentally, noting every change to a quotation—however minor—builds trust that the writer is accurately quoting the governing precedent.

For this reason, when I use (cleaned up), I still bracket any capitalization alterations that I make to the quoted text.  This practice better balances the competing interests of readability and accuracy that (cleaned up) seeks to serve.  And tweaking the scope of (cleaned up) in this manner is just the sort of clarification to a prevailing practice that would be legitimate for the *Bluebook* to make and deserving of our respect or acquiescence if it did so.  Unfortunately, the *Bluebook* chose not to focus on this or other appropriate clarifications.

\*   \*   \*

Perhaps a future edition of the *Bluebook* will correct course—authorizing not just the practice of cleaning up quotations but also the name (cleaned up).  Until then, I see no reason to shift to a less accurate alternative.  After all, the *Bluebook* has not authorized (cleaned up) for the past eight years.  And that hasn't stopped the exponential growth in its use.  We should not let (cleaned up) die now.

Badding, J., joins this special concurrence.